Argued and submitted January 6; resubmitted en banc April 2, reversed and remanded with instructions May 22, 2003

In the Matter of the Marriage of

Gretchen D. HUTCHINSON,
nka Gretchen Delius,
*Respondent,*

*and*

Robert B. HUTCHINSON, II,
*Appellant.*

15-99-14554; A116876

69 P3d 815

Inge D. Wells argued the cause for appellant. With her on the brief was Wells & Wells.

Mark D. Perrin argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

BREWER, J.

Armstrong, J., concurring.

Edmonds, J., concurring in part, dissenting in part.

### BREWER, J.

Husband appeals from a judgment that modified his monthly spousal support obligation to wife by reducing it from $6,000 to $3,000. Husband contends that the trial court should have reduced the support award to $250 per month and that, because he is unemployed and has no immediate prospects of finding employment, the court erred in attributing to him potential income of $120,000 per year. Husband also assigns error to the court's decision to make the modification retroactive to April 1, 2001, the due date of the support installment accruing in the month after he filed his motion for modification, rather than ordering wife to execute a satisfaction of any support arrearages that had accrued since December 1, 2000, pursuant to terms specified in the parties' marital settlement agreement (MSA). On *de novo* review, we reduce husband's spousal support obligation to $1,500 per month, effective April 1, 2001.

The parties were married in 1967, and they separated in 1999. They have two adult children. In July 2000, when their marriage was dissolved, husband was 58 years old and wife was 54 years old. Husband had a college degree and, for many years, had been a successful marketing executive for major hotel enterprises. Beginning in 1979, the parties resided in Asia so that husband could pursue his career. In March 2000, husband was terminated from his employment with a Hong Kong-based hotel business. At that time, husband was earning an annual salary of $240,000. Husband then worked as a consultant for several hotel clients until June 2000, earning approximately $48,000 for that work. Husband was unemployed in July 2000, when the dissolution judgment was entered.

Wife earned a bachelor's degree in 1969. She was employed as an elementary school teacher for two years early in the marriage. However, wife worked as a homemaker throughout the remainder of the marriage. After the parties moved to Asia, wife wrote travel articles as a hobby, but she did not receive any income from that activity. Wife moved to Oregon when the parties separated in 1999.

The parties' MSA, which was incorporated into the dissolution judgment, provided that husband would pay indefinite spousal support of $6,000 per month to wife. It also divided the parties' property. Wife was awarded the condominium in which she resides; two rental properties; two parcels of property in the Phillippines, one that she owns outright and another that she co-owns with husband; half of husband's retirement accounts and severance pay from his last job; and half of his retirement benefits from a previous job. Husband was awarded his interest in a trust created by his family, consisting of a parcel of property in Washington, plus the other half of the accounts and benefits described above.

The MSA also contained the following provision:

"Husband is currently unemployed. Husband shall make good faith efforts to obtain employment. If Husband obtains employment hereafter defined as being an employee, owner, operator, or CEO of a business or acting as an independent contractor, less reasonable business expenses * * * within six months of May 1, 2000, the parties shall re-evaluate the support at that time without the need to show an unanticipated substantial economic change in circumstances. The parties acknowledge that Husband had a brief contract which has been completed where he received income during the finalization of this case that shall not be considered a basis for re-evaluation or modification of support. Any increase or decrease in support that results from any evaluation or modification proceedings filed, shall be effective the month in which Husband begins employment. If Husband fails to obtain employment within six months of May 1, 2000, he shall have the right to seek modification, without the need to show an unanticipated substantial economic change in circumstances with any such modification taking effect the seventh month from May 1, 2000. If Husband fails to obtain a modification, support shall continue at $6,000 per month until an agreement is reached by the parties or further order of the Court. If Husband's salary * * * should exceed $250,000, * * * Wife shall be able to during the next 36 months from May 1, 2000, seek a modification to increase spousal support without the need to prove an unanticipated substantial economic change of circumstance. The court shall consider evidence of the parties' life style during the marriage in that hearing. If during the 36

months from May 1, 2000, Husband's salary * * * falls below $250,000 * * * despite his good faith efforts, Husband has the right to seek modification without the need to show an unanticipated substantial change in circumstances."

The MSA did not expressly specify the purpose of the spousal support award.[1] However, the award provided wife with approximately 30 percent of husband's pretax income based on his most recent annual salary of $240,000.

Husband did not secure employment after the dissolution. On March 28, 2001, he moved to modify his support obligation to $1,500 per month for a period of three years. In June 2001, husband moved back to the United States to live with his parents in order to "live much more cheaply[.]" In September, he amended his motion to request termination of spousal support or, in the alternative, a permanent reduction to an amount "to be determined at trial." Also in September, husband received a tax refund of more than $33,000.

The case was tried in October 2001. At trial, husband requested a reduction in spousal support to $250 per month. He testified that he had used his share of the property division and a portion of the tax refund to pay his living expenses, legal fees, and spousal support. Husband's uniform support affidavit showed monthly income of $413 per month, based on annualizing a one-time gift from his mother plus interest income of $80, to offset monthly expenses of approximately $2,550, excluding spousal support. At the time of trial, husband still had $21,700 of the refund proceeds.

Husband acknowledged that he had rejected a job offer, in late 2000, for $120,000 per year and that he recently had applied for a job that would have paid an annual salary of $150,000. He testified that he had attempted to find work by networking with colleagues and employment agencies and looking through the newspaper classifieds. He stated that his search had been impeded by several factors, including his

---

[1] ORS 107.105(1)(d) provides that, "[i]n making the spousal support order, the court *shall* designate one or more categories of spousal support and shall make findings of the relevant factors in the decision." (Emphasis added.) However, the 1999 version of the statute applied only to "petitions for annulment, dissolution or separation filed on or after" October 23, 1999. Or Laws 1999, ch 587, § 3. This action was commenced in August 1999.

age; his specialized qualifications and experience; the difficulty of locating work in Asia and, for that matter, in the United States after having worked abroad for 20 years; the repercussions on the hotel industry of the events of September 11, 2001; and the blow that prolonged unemployment had delivered to his confidence level.

At the time of modification, wife was working 30 to 40 hours per week at an hourly rate of $9, without benefits, in a "paint-your-own-pottery" business. She had no plans to return to teaching. She testified that, even if she renewed her teaching certification—a two-year process—her prospects for finding work in her teaching field, art, were poor. Wife had invested the liquid assets that she received in the property division in several investment accounts, one of which had lost value. Wife testified that, in order to make ends meet, she had been forced to dip into assets that she had hoped to preserve for her retirement.[2] At the time of modification, wife had monthly income of approximately $1,200, excluding spousal support payments, and monthly expenses of approximately $4,220, including a $1,400 payment on her condominium and a $930 car payment and excluding an estimated $1,000 monthly payment for attorney fees.

Wife called as a witness a career and placement consultant, who identified job categories as well as actual openings for which husband was qualified, including a position in the $120,000 to $150,000 range. He stated that "in the 50, $60,000 range represents the type of job in this occupation that I would think [husband] would have no trouble getting at all" but that jobs in a range exceeding $120,000 per year are "less plentiful and more difficult to get." The witness concluded that, although he "could be way off," husband could find work in the lower salary range by January 2002, and in the higher range by the next summer.

The trial court determined that husband had an earning capacity of $120,000 per year, and it modified the

---

[2] Husband's spousal support obligation was current until December 2000. In December, husband paid $1,000. However, he made no support payments in the next two months, and he paid only $1,500 per month from March through August 2001. Husband made no spousal support payments after August 2001.

spousal support award to $3,000 per month, effective April 1, 2001.

In his first assignment of error, husband argues that the trial court erred in attributing to him a potential annual income of $120,000 because he had been unemployed since mid-2000, and he had no immediate prospects of finding employment at that salary level. In response, wife reminds us that husband turned down a job offer for $120,000 per year and that he had interviewed for a job paying $150,000 per year shortly before the modification trial. Wife also asserts that husband failed to rebut her evidence that husband was qualified for employment at an annual salary in the range of $120,000 to $150,000.

■■ An award of spousal support may be modified based on a finding that there has been a substantial, unanticipated change in circumstances since the time of the earlier award. *Tomos and Tomos*, 165 Or App 82, 87, 995 P2d 576 (2000). If the requisite change in circumstances is established, " '[t]he overriding consideration in determining the appropriate amount of spousal support is what is "just and equitable," * * * under the totality of the circumstances.' " *Halsey and Halsey*, 180 Or App 169, 177, 41 P3d 1119 (2002) (quoting *Albrich and Albrich*, 162 Or App 30, 37, 987 P2d 542 (1999)). In this case, the MSA provided that, if husband failed to obtain employment by November 1, 2000, he was entitled "to seek modification without the need to show an unanticipated substantial economic change in circumstances." Because it is undisputed that husband failed to obtain employment by November 1, 2000, that provision eliminates the requirement that he must show a change of circumstances in order to obtain a modification of his support obligation. *McDonnal and McDonnal*, 293 Or 772, 779, 652 P2d 1247 (1982); *Hearn and Hearn*, 128 Or App 259, 263, 875 P2d 508 (1994). That said, our inquiry is narrower still. Husband does not challenge the indefinite duration of the support award. The focus of his first assignment of error is limited, instead, to the amount of the support award.

■■ Our goal on modification is not to reconsider the validity of the initial award but to fulfill its purpose. *Bates and Bates*, 303 Or 40, 45 n 3, 733 P2d 1363 (1987). Where, as

here, the purpose of the spousal support award is not indicated in the dissolution judgment, our task is to maintain the relative financial positions in which the judgment placed the parties. *Halsey*, 180 Or App at 176 (citing *Bates*, 303 Or at 47). In doing so, we look to the parties' MSA to inform our inquiry. *Id.* The MSA focused primarily on husband's earning capacity; specifically, it premised any support modification that would excuse proof of a change in circumstances on husband's income level.

ORS 107.135(3) provides, in part:

"In considering under this section whether a change in circumstances exists sufficient for the court to reconsider spousal or child support provisions of a decree, the following provisions apply:

"(a) The court * * * shall consider income opportunities and benefits of the respective parties from all sources, including but not limited to:

"(A) The reasonable opportunity of each party, the obligor and obligee respectively, to acquire future income and assets."

In *Albrich*, 162 Or App at 35, we said:

"[ORS 107.135(3)(a)] compels an expansive review of a party's ability to pay and of a party's need. Significantly, [paragraph] (3)(a) does not restrict the court's consideration to income that either party is presently receiving * * *. Put simply, under [paragraph (3)(a)], the breadth of the court's *consideration* of the parties' income is without limits."

(Emphasis in original.) Thus, in determining an appropriate spousal support level, we consider the parties' earning capacities and, as pertinent here, husband's potential future income.

■ According to husband, the trial court's decision is flawed because it set support at a level that he cannot afford to pay, given that he remains unemployed. Husband relies on the principle that, "although spousal support may be fixed based on forecast income, the forecast must be predicated on facts existing at the time the award is made." *Weber and Weber*, 184 Or App 190, 201, 56 P3d 406 (2002), *rev allowed*, 335 Or 195 (2003); *see also Waterman and Waterman*, 158 Or

App 267, 271, 974 P2d 256 (1999) (stating that courts should be circumspect about imposing a support award "based on income not presently available"); *Curran and Curran*, 100 Or App 330, 333, 786 P2d 205 (1990) (modifications are "properly based only on evidence of a party's present or future ascertainable ability to pay, not on speculative or uncertain future events").

■    Although the principle upon which husband relies is sound, it advances his position only a limited distance. We have repeatedly rejected the notion that a spousal support award must be based solely on a party's *actual* income. *See Wilson and Wilson*, 186 Or App 515, 523-26, 63 P3d 1244 (2003) (rejecting the obligor's argument that the trial court was required to consider only what he actually earned rather than his expected future income); *McCarthy and McCarthy*, 170 Or App 183, 190-91, 12 P3d 519 (2000) (attributing a capacity for full-time employment to the obligor even though, during the marriage, the parties had agreed that he would work part time); *Pagano and Pagano*, 147 Or App 357, 363-64, 935 P2d 1246 (1997) (holding that the husband's spousal support obligation must be based on his earning capacity as an anesthesiologist, rather than llama rancher, where he was driven to change professions because of the stress of the dissolution and nothing prevented him from returning to the practice of medicine). In observing the sometimes faint line between speculation and reasonable inference, courts must determine whether "there is enough information to make an informed prediction as to changes in future earning capacity." *Furlong and Furlong*, 120 Or App 105, 109, 852 P2d 233 (1993).

■    The trial court concluded that it was "completely reasonable" and "a very fair estimate to anticipate that [husband] can have potential income in the ra[n]ge of $120,000" and that a lower figure "would be a fairly significant undervaluation of [husband's] talent and abilities[.]" However, the only evidence upon which that determination could have been made was the single job offer that husband turned down. Husband testified that he rejected that offer because he was simultaneously negotiating for a better, higher-paying position and that the terms and circumstances of the offer suggested that it might not be reliable or long term.

Husband also testified that he would accept the offer if it were renewed but that he had not since received any offers of employment at that salary level. At the time of trial, husband had applied for a job that would have paid $150,000 per year, but he testified that his chances of landing it were "rather slim."

Wife does not suggest that husband's explanation is disingenuous. In fact, wife's expert witness testified that jobs in husband's field in the $120,000 salary range are "less plentiful and more difficult to get" and that, although he could be "way off," he estimated that it would take husband until the following summer to obtain employment at that income level. Further, the witness identified only one job opening in husband's field that, at the time of trial, offered an annual salary in the range between $120,000 and $150,000.[3] The fact that husband might obtain employment in that income range sometime in the future would not support a finding that it reflected his earning capacity at the time of trial. To the contrary, based on the record before us, a determination that husband had an earning capacity of at least $120,000 per year would be speculative.

■ On the other hand, there is no evidence that husband is unemployable. It is undisputed that he is a talented professional who enjoys good health. Wife's expert witness testified that "the 50, $60,000 range represents the type of job in this occupation that I would think [husband] would have no trouble getting at all" and that husband could probably get a job in that lower salary range right away. He also identified numerous current job openings in husband's field that fell into that salary range. Husband presented no evidence to the contrary. On *de novo* review, we determine that, at the time of trial, husband's earning capacity was $60,000 per year.

■ Based on that earning capacity, we conclude that husband's spousal support obligation should be set at $1,500 per month. Although the correlation is not talismanic, that amount, as did the initial support award, stands at 30 percent of husband's pretax earning capacity. It will provide

---

[3] The opening was in Boston, although the witness testified that the prospective employer would consider "telecommuting."

husband with a monthly cash flow of approximately $2,300 and wife with a monthly cash flow of $2,700 from spousal support and her other income. That distribution inevitably will require both parties to make adjustments to their monthly expenses, but it acknowledges wife's greater dependence on a stable level of income. Husband is able to live on his family's property with minimal expenses, and his earning capacity is more upwardly elastic than is wife's. *See McArdle and McArdle*, 186 Or App 672, 677, 64 P3d 1178 (2003) (reasoning that maintaining the parties' positions relative to each other involves more than pure mathematical precision but also requires that we consider the totality of the circumstances in determining a just and equitable result). If a further change of circumstances occurs, of course, either party may again seek a modification of the support amount.

In his second assignment of error, husband asserts that the "trial court erred in failing to make the reduction in Husband's support obligation retroactive to December of 2000, as agreed to by the parties in their [MSA]." He relies on the following provision of the MSA:

"If Husband fails to obtain employment within six months of May 1, 2000, he shall have the right to seek modification * * * with any such modification taking effect the seventh month from May 1, 2000. If Husband fails to obtain a modification, support shall continue at $6,000 per month until an agreement is reached by the parties or further order of the Court."

However, notwithstanding his reliance on that provision, husband also acknowledges that "the court may not make a modified support order retroactive to a date before [his] motion was filed." That concession appears to be based on ORS 107.135, which provides, in part:

"(5) Any modification of spousal support granted because of a change of circumstances may be ordered effective retroactive to the date the motion for modification was filed or to any date thereafter.

"(6) The decree is a final judgment as to any installment or payment of money that has accrued up to the time either party makes a motion to set aside, alter or modify the decree, and *the court does not have the power to set aside,*

*alter or modify such decree, or any portion thereof, that provides for any payment of money, either for minor children or the support of a party, that has accrued prior to the filing of such motion.* However:

"(a) The court may allow a credit against child support arrearages for periods of time, excluding reasonable parenting time unless otherwise provided by order or decree, during which the obligated parent has physical custody of the child with the knowledge and consent of the custodial parent; and

"(b) The court or the administrator, as defined in ORS 25.010, may allow, as provided in the rules of the Child Support Program, a credit against child support arrearages for any Social Security or Veterans' benefits paid retroactively to the child, or to a representative payee administering the funds for the child's use and benefit, as a result of a parent's disability or retirement."

(Emphasis added.)

Thus, apparently recognizing that, by their terms, the quoted provisions of ORS 107.135 are inconsistent with his assignment of error as initially framed, husband ultimately, and without explanation, asserts only that the court "can and should order that Wife satisfy any support judgment in excess of the modified amount for that period of time," that is, between December 2000 and the filing of his motion to modify in March 2001. For the reasons that follow, we reject husband's assignment of error both as initially framed and as presented in his later, undeveloped argument.

As to husband's argument, as initially framed in his assignment of error, that the trial court erred in failing to order a retroactive modification to a date before the filing date of husband's motion, we conclude that, to the contrary, ORS 107.135(6) expressly withholds that power from the court. The statute provides that a court does not have the "power" to modify any portion of a judgment that provides for payment of support that has accrued before the filing of a motion for modification. We interpret that statute in accordance with the methodology prescribed by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We examine the text of the statute in context, giving

words of common usage their ordinary meanings. *Id*. When examining statutory context, "relevant are any prior judicial decisions construing the statutory language at issue. "*Cooksey v. Portland Public School Dist. No. 1*, 143 Or App 527, 531, 923 P2d 1328, *rev den*, 324 Or 394 (1996) (citing *State v. Sullens*, 314 Or 436, 443, 839 P2d 708 (1992)).

"Power" is defined as "legal authority * * * *specif[ically]* : the ability to change legal relations * * *," *Webster's Third New Int'l Dictionary* 1779 (unabridged ed 1993), and as "[t]he ability to act or not act" and "[t]he legal right or authorization to act or not act," *Black's Law Dictionary* 1189 (7th ed 1999). In turn, "authority" is defined as "[g]overnmental power or jurisdiction ‹within the court's authority›." *Id*. at 128. Consistently with that ordinary meaning, and subject to exceptions that are inapplicable here, ORS 107.135(6) deprives a trial court of authority to make a support obligation retroactive to a date before the filing date of a motion to modify that obligation. *See Thomsen and Thomsen*, 167 Or App 218, 223, 2 P3d 432 (2000) ("[I]t is well settled that we may modify spousal and child support awards only from the date of the motion for modification forward; all amounts previously in arrears have become judgments and may not be modified, except in very narrow circumstances not at issue here."); *see also Edwards and Edwards*, 73 Or App 272, 280, 698 P2d 542 (1985) (interpreting identical language in previous statute to mean that "installments of spousal support that have accrued before a motion to modify is made become final judgments beyond the power of the court to alter").

We have recognized in other contexts that parties may not confer, by agreement, authority that a court does not have. *Cf. Taylor v. McCollom*, 153 Or App 670, 684, 958 P2d 207 (1998) ("private parties cannot by private agreement confer or impose on [the Court of Appeals] authority that it is not granted by statute"). "When sitting as a domestic-relations court, a circuit court has only that authority granted by statute." *Spady v. Graves*, 307 Or 483, 488, 770 P2d 53 (1989). As that principle applies here, regardless of the *parties'* agreement, it is the *court* that must enforce that agreement and, in doing so, it cannot exceed its statutory authority. In short,

the MSA cannot confer authority on the court that ORS 107.135(6) expressly withholds.

In rejecting our conclusion, the dissent urges that, "[a]t stake in this case is the public policy that persons shall have the utmost liberty of contracting and that their contracts, when entered into freely and voluntarily, are enforceable by courts absent circumstances that make such agreements unfair or illegal." 187 Or App at 751 (Edmonds, J., concurring in part, dissenting in part). The dissent then discusses the embodiment of that policy in several cases and in ORS 107.104 and ORS 107.135(12). *Id.* at 750-55, 757 (Edmonds, J., concurring in part, dissenting in part). We do not disagree that the policy the dissent describes is of significant importance. However, it does not alter the principle that courts cannot enforce agreements that "conflict with the statutory powers of the court." *McDonnal*, 293 Or at 779; *see also* ORS 107.104 (reasoning that it is the policy of this state "[f]or courts to enforce the terms of [MSAs] *to the fullest extent possible, except when to do so would violate the law* or would clearly contravene public policy" (emphasis added)); ORS 107.135(12)(a)(B) (reasoning that it is the policy of this state "[f]or courts to enforce the terms of settlements described in paragraph (b) of this subsection *to the fullest extent possible, except when to do so would violate the law* or would clearly contravene public policy" (emphasis added)).

Relying, in part, on *Hearn* and *Eidlin and Eidlin,* 140 Or App 479, 916 P2d 338 (1996), the dissent remonstrates that the question is whether "the parties' agreement to retroactively modify husband's support obligation * * * conflict[s] with the court's statutory authority under ORS 107.135(6)." 187 Or App at 755 (Edmonds, J., concurring in part, dissenting in part). The dissent argues that the MSA provision at issue here is like provisions that we have upheld in other cases where the court's authority to "enforce" a marital settlement agreement "finds its source, not in ORS 107.135, but in the statutory power of the court to 'approve an agreement for the entry of an order for the support of a party' under ORS 107.105(1)(d)." 187 Or App at 756-57 (Edmonds, J., concurring in part, dissenting in part).

The cases on which the dissent relies—*McDonnal*; *Eidlin*; *Hearn*; *Porter and Porter*, 100 Or App 401, 786 P2d 740, *rev den*, 310 Or 281 (1990); *Barron and Barron*, 85 Or App 278, 736 P2d 583 (1987); *Pope and Pope*, 73 Or App 242, 698 P2d 518 (1985), *aff'd*, 301 Or 42, 718 P2d 735 (1986)—are inapposite. *McDonnal*, *Eidlin*, *Hearn*, and *Barron* each upheld agreements that dispensed with the change of circumstances requirement, which, as the court observed in *McDonnal*, began as a "rule of case law, not statutory law." *McDonnal*, 293 Or at 783. Moreover, the statutes that embody that rule, ORS 107.135(2) and (3), primarily define what constitutes a change in circumstances. Unlike ORS 107.135(6), which expressly prohibits the retroactive modification of a support obligation, ORS 107.135(2) and (3) do not provide that a court "does not have the power" to modify a support obligation unless a change in circumstances has been shown.

*Pope*, on the other hand, upheld a provision that ran counter to "the principle that when the dependent spouse remarries, support will terminate unless the new spouse is unable to provide support." 73 Or App at 247. Finally, *Porter* involved a "policy" that courts on their own could not impose nominal awards. *See Porter*, 100 Or App at 407, 407 n 1 (Edmonds, J., dissenting). Those cases likewise did not involve agreements that conflicted with an express statutory prohibition.

Unlike in those cases, the MSA provision at issue here conflicts with a statute that expressly limits the court's power. More in point is *Heinonen and Heinonen*, 171 Or App 37, 42, 14 P3d 96 (2000), where we invalidated a provision that designated a person, rather than the court, to decide visitation disputes. We found no "statute that might authorize" the court to delegate its statutory authority to a nonjudicial designee. We held that the court's adoption of the parties' stipulation was "in direct conflict with the statutory grant of that power to the court." *Id.* at 44. *Heinonen* presents a mirror image of the circumstances in this case. Enforcement of the MSA provision in the manner requested by husband would not constitute an unlawful *usurpation* of a power conferred by statute on the courts; rather, it would require judicial *assumption* of a power that a statute expressly withholds

from the courts. Logically, the latter could be no more lawful than the former.

We also are troubled by the dissent's construction of ORS 107.135(6) as "providing limitations on and exceptions to that grant of authority [to order retroactive modification]." 187 Or App at 756 (Edmonds, J., concurring in part, dissenting in part). The introductory portion of subsection (6), specifically the phrase "the court does not have the power," has been in effect since 1921, Or Laws 1921, ch 114, § 1, and the remainder of the wording of that subsection was added in 1961. Or Laws 1961, ch 429, § 1. A prior version of subsection (5) was first enacted, in substantially different form, in 1987. Or Laws 1987, ch 885, § 3. It was not until 1997 that the legislature enacted the current version of subsection (5). Or Laws 1997, ch 91, § 1. The order in which the two subsections were enacted demonstrates that subsection (6) was *not*, as the dissent suggests, enacted as a limitation on section (5). Rather, subsection (6) has independent significance. Moreover, subsection (6) cannot mean other than what it plainly says: courts do not have the power to make a modification retroactive to a date before the filing date of the motion to modify. The parties' agreement cannot trump the statute in that regard. Likewise, nothing in ORS 107.105(1)(d) would permit the court to ignore ORS 107.135(6).

We turn briefly to husband's argument that the relevant provision of the MSA provides a basis for imposing on wife an obligation to execute a satisfaction of husband's support arrearages that accrued after December 2000 and before husband filed his motion. That argument is so undeveloped that we would hesitate to address it if it did not appear to be a cornerstone of the dissent's analysis. *See* 187 Or App at 755 (Edmonds, J., concurring in part, dissenting in part) ("the parties agree[d] to retroactively satisfy husband's support obligation"); *see also State v. Mendez*, 308 Or 9, 19, 774 P2d 1082 (1989) (declining to address undeveloped state constitutional argument). In fact, the dissent expands husband's argument into one that the parties have not addressed at all, namely, that husband has, in effect, brought a claim for *specific performance* to enforce wife's supposed obligation, under the MSA, to accept retroactive modification of his spousal

support obligation. 187 Or App at 756-57 (Edmonds, J., concurring in part, dissenting in part). The question of whether the court could, by means of enforcing an agreement to satisfy a support obligation retroactively, effectively accomplish what ORS 107.135(6) proscribes in the context of a modification proceeding, is a legitimate one. However, it has not been adequately developed by husband and, thus, the dissent appears to have embarked on a solitary analysis in addressing it.

Even assuming, though, that husband's undeveloped argument is properly before us, it is unpersuasive. The relevant provision merely states that, if husband fails to obtain employment within six months of May 2000, he may "seek modification," and "any such modification" will "tak[e] effect the seventh month" from May 1, 2000. It apparently contemplates that husband was required to seek employment for at least six months before requesting modification based on his failure to obtain such employment. Had husband, in fact, filed his motion to modify at the earliest time permitted under the MSA—that is, at the end of that six-month period—ORS 107.135(6) would not have prevented the trial court from modifying his obligation as of that date.

However, the quoted provision does not expressly address the consequences of husband filing his motion to modify at a later date. At best for husband, it could be read implicitly to provide that *any modification*, regardless of when husband filed his motion, would "take effect" in December 2000. As discussed, such a construction would run afoul of ORS 107.135(6), thereby making the provision unenforceable. But husband fails to explain how the quoted provision could be construed as an agreement between the parties that, regardless of when husband filed his motion, the court must order wife to *satisfy* support amounts payable after December 2000. We cannot conclude that the parties intended such an arrangement.[4]

---

[4] Thus, we express no opinion as to the issue on which the dissent, but not husband, dwells at length: whether a trial court could, despite ORS 107.135(6), order an obligee to satisfy support arrearages that accrued before the filing of a motion to modify a support obligation where such an arrangement is provided for in an MSA.

The trial court did not err in declining to modify husband's support obligation retroactively to December 2000 or in refusing to order wife to execute a satisfaction of support arrearages accruing before April 1, 2001.

Reversed and remanded for entry of modified judgment reducing spousal support to $1,500 per month, effective April 1, 2001.

**ARMSTRONG, J.,** concurring.

■ I agree with the majority except for its conclusion that the court lacked authority to enforce the parties' marital settlement agreement to the extent that it authorized the court to modify a spousal support award retroactively. On that issue, I agree with Judge Edmonds' analysis of the relevant legal principles. I am persuaded, however, that the parties' agreement does not, in fact, authorize the court to modify wife's spousal support award for a period earlier than the date on which husband moved to modify the award. I therefore concur in the majority's disposition of husband's request to make the change in wife's award retroactive to December 1, 2000.

**EDMONDS, J.,** concurring in part, dissenting in part.

I agree with the majority opinion in all respects except with its holding that the parties' agreement that accrued spousal support can be retroactively modified to December 1, 2000, conflicts with ORS 107.135(6) and therefore is unenforceable.

ORS 107.135(6) provides, in pertinent part,

"[T]he court does not have the power to set aside, alter or modify such decree, or any portion thereof, that provides for any payment of money, either for minor children or the support of a party, that has accrued prior to the filing of such motion."

The parties' agreement provides that

"[i]f Husband fails to obtain employment within six months of May 1, 2000, he shall have the right to seek modification * * * with any such modification taking effect the seventh month from May 1, 2000."

Husband filed his motion to modify his support obligation on March 28, 2001. Husband argues, based on the above provision in his agreement with wife, that he is entitled to a retroactive modification of accrued support obligations to December 1, 2000, even though the court lacks authority under ORS 107.135(6) to make such a modification on its own.

Husband's argument is correct. At stake in this case is the public policy that persons shall have the utmost liberty of contracting and that their contracts, when entered into freely and voluntarily, are enforceable by courts absent circumstances that make such agreements unfair or illegal. The parties' agreement does not conflict with the court's statutory authority, nor does it contravene some other overriding public policy, as will be amplified more fully below. Therefore, the majority errs when it holds that the parties' agreement is unenforceable.

Some background is helpful in understanding why the parties' agreement does not conflict with the authority of the court under ORS 107.135(6). In *Feves v. Feves*, 198 Or 151, 159, 254 P2d 694 (1953), the Supreme Court addressed for the first time in this state's jurisprudence the issue of when a private agreement between parties involved in a dissolution of marriage proceeding will be deemed enforceable, even though it makes modification of a prior support award easier than the statutory authority of the court would otherwise allow. In that case, the parties' marriage was dissolved in 1940. The judgment provided for indefinite spousal support of $35 per month to the wife. In 1948, the parties entered into a new agreement. With regard to the agreement, the court observed that

"it was entered into by parties who were dealing at arms length; both were sui juris. Each was represented by able counsel. There was not the slightest taint of fraud, misrepresentation, or unfairness on the part of either party in connection with the making of the contract. Both dealt with their eyes open."

*Feves*, 198 Or at 159.

In their new agreement, the parties in *Feves* agreed that the provisions of the judgment would be modified in several particulars, including the deletion of the spousal support award in consideration of a cash settlement. The agreement was not presented to the court for approval. In 1951, the plaintiff sought a modification of the original judgment, seeking an increase in spousal support to $200 per month. The defendant husband asked that the 1948 agreement be enforced. The trial court modified the award of spousal support to $100 per month, and the defendant appealed.

The court began its analysis in *Feves* by applying a rule of law previously applied in cases involving contracts in restraint of trade:

> "It is axiomatic that public policy requires that persons of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice; and it is only when some other overpowering rule of public policy intervenes, rendering such agreements unfair or illegal, that they will not be enforced."

198 Or at 159. The court first observed that, in view of the public policy underlying the authority of courts to award spousal support when needed, an agreement nullifying an award of spousal support was subject to the approval of the court before it could be binding on the parties. Because the Feves' agreement was not presented to the trial court for approval, the Supreme Court held that it did not become binding, even though it had been completely executed in 1948. It then considered what effect should be given to the agreement with regard to the plaintiff's motion for modification of the spousal support award, and it concluded that, inasmuch as the agreement was fair, was based on consideration, and had been completely executed, it should have been approved by the trial court. The court concluded that the award of spousal support in the original judgment should have been terminated by the trial court.

The issue of when a private agreement will usurp the statutory authority of the court arose next in *McDonnal and McDonnal*, 293 Or 772, 652 P2d 1247 (1982). In that

case, the parties entered into a marital settlement agreement at the time of dissolution that provided for three years of spousal support and that the award "may be reviewed by the court at the expiration of three years." *McDonnal*, 293 Or at 775. At the end of the three years, the wife filed a motion to continue and to increase spousal support. The Supreme Court acknowledged that there was not sufficient evidence of a substantial change of circumstances as required by statute to authorize a court to extend the duration of support. However, it held the parties' agreement enforceable. It explained,

> "The parties' own resolution of their dispute should be accorded great weight. In all cases of dissolution the court exercises full equity powers. ORS 107.405. Where parties have foregone their opportunity to litigate disputes and have chosen instead to enter into an agreement their reliance on the agreement can be presumed. *Inequity may result if this court adopts a policy of less than full enforcement of mutually agreed upon property and support agreements.*"

*Id.* at 779 (emphasis added). It also cautioned,

> "We do not suggest that a property settlement providing for spousal support may go so far as to preclude the court's statutory power to modify support even where changed circumstances exist. * * * However, short of conflict with the statutory powers of the court we recognize the court's responsibility to discover and give effect to the intent of the parties as reflected in the incorporated settlement agreement."

*Id.*

In a series of cases following *McDonnal*, we have applied the above principles to varying circumstances. In *Pope and Pope*, 73 Or App 242, 698 P2d 518 (1985), *aff'd*, 301 Or 42, 718 P2d 735 (1986), we upheld an agreement by the husband to pay spousal support under circumstances in which it could not have been ordered under ORS 107.135. We stated that the statutory authority of the court to terminate spousal support upon remarriage "must be balanced against the strong public policy of enforcing such agreements[.]" *Id.* at 248. In *Porter and Porter*, 100 Or App 401, 786 P2d 740, *rev den*, 310 Or 281 (1990), we upheld the validity of an

agreement, even though the agreement was in contravention of ORS 107.135, that the husband would pay a nominal amount of spousal support indefinitely and that the amount and duration of support would remain subject to the further order of the court. A trial court would have had no authority to make such an award. Nonetheless, we explained, "Courts should enforce, not disturb, negotiated, settlement agreements, unless there is an overriding public policy reason for not doing so." *Porter*, 100 Or App at 404.

In *Hearn and Hearn*, 128 Or App 259, 875 P2d 508 (1994), the parties, in a stipulated judgment of dissolution, provided that the court would retain jurisdiction over an award of spousal support for at least 45 months, at which point it could consider the amount and duration of support anew, based on the circumstances existing at the time. Again, no authority existed for a trial court to make such an award on its own. After referring to *McDonnal*, *Pope*, and *Porter*, we concluded,

> "We find no principled basis on which to distinguish the foregoing authorities. They instruct that negotiated agreements as to the amount and duration of spousal support should be enforced, unless they deprive the court of its statutory authority or contravene some other overriding public policy. In this case, the parties unambiguously intended that the trial court retain the authority to modify spousal support without either of the parties being required to demonstrate a substantial change in circumstances. That bargained-for stipulation does not deprive the court of any statutory authority; nor does it contravene any overriding public policy of which we are aware. Accordingly, we find the parties' agreement enforceable."

*Hearn*, 128 Or App at 265-66.

Finally, in *Eidlin and Eidlin*, 140 Or App 479, 916 P2d 338 (1996), the parties stipulated that a change in circumstances justifying a modification of spousal support awarded to the wife would be deemed to have occurred if the husband obtained permanent employment and if the employment would have supported a different award, had the husband been so employed at the time of the dissolution. Relying on the above authorities, we said,

"Even assuming, that the parties' stipulation provides a more permissive basis for seeking modification than does the statute, that alone does not require that the stipulation be disregarded. * * * [I]n the absence of adverse public policy considerations, parties can make it easier to obtain a modification by agreeing to additional grounds therefore but their stipulations cannot remove the court's authority to modify a spousal support award on the bases that are articulated in ORS 107.135. Although a court is not *required* to accept parties' stipulated agreements as to what will constitute a change of circumstances, the trial court's decision to do so here was proper because the agreement is neither unfair nor does it 'conflict with the statutory powers of the court.' * * * The court did not err in giving effect to 'the intent of the parties as reflected in [their] incorporated settlement agreement.' "

*Id.* at 483-84 (emphasis in original; citations omitted).[1]

Under the above authorities, the test in this case regarding the enforceability of the parties' agreement is twofold. Does the parties' agreement to retroactively satisfy husband's support obligation as of December 1, 2000, conflict with the court's statutory authority under ORS 107.135(6), or does it contravene any overriding public policy? The majority does not contend that the parties' agreement violates any public policy. Rather, it reasons that parties may not by agreement confer authority on a court that it does not have. It follows from that premise, according to the majority, that "regardless of the parties' agreement, it is the court that must enforce that agreement and, in doing so, it cannot exceed its statutory authority." 187 Or App at 745 (emphasis omitted). The majority's reasoning is wrong because it interprets the scope of ORS 107.135(6) too broadly and inconsistently with the above case law.

ORS 107.135(6) is part of a statutory scheme that, in part, authorizes trial courts to modify spousal support provisions in dissolution of marriage judgments based on a change

---

[1] *See also Barron and Barron,* 85 Or App 278, 283, 736 P2d 583 (1987) (holding that a written settlement agreement incorporated into a dissolution judgment authorizing a court to modify spousal support without a demonstration of a substantial change in circumstances is enforceable).

of circumstances occurring after the entry of a prior judgment. Specifically, ORS 107.135(1) provides that a court "may at any time after a decree of * * * dissolution of marriage * * * (a) [s]et aside, alter or modify so much of the decree as may provide for * * * the support of a party[.]" ORS 107.135(2) and (3) specify what a change of circumstances may include that will support the modification of a prior judgment. ORS 107.135(5) and (6) refer to the scope of relief available under the grant of authority in the preceding statutes. All of the statutes must be read together to give effect to all. ORS 174.010. Subsection (5) authorizes the court to order modification of spousal support as of the date the motion for modification was filed or any date thereafter. While subsection (5) authorizes generally the retroactive modification of accrued judgments "because of a change of circumstances[,]" subsection (6) provides limitations on and exceptions to that grant of authority. The first phrase of the first sentence of the section establishes that support obligation installments that become due constitute final judgments. The second phrase of the first sentence provides that "the *court* does not have the power to set aside, alter or modify such decree, or any portion thereof * * * that has accrued prior to the filing of such motion." (Emphasis added.) The language "[s]et aside, alter or modify" tracks with the language of ORS 107.135(1). The words "such motion" refer to a motion filed pursuant to subsection (1) of the statute. Paragraphs (6)(a) and (b) provide for exceptions to the prohibition that subsection (6) places on the *court* regarding the setting aside, altering or modifying of support judgments. In effect, when the subsections are read together, they authorize the court to set aside, alter, or modify accrued support judgments, but that authority is limited to those judgments that "accrued prior to the filing of such motion."

Significantly, subsections (5) and (6) of ORS 107.135 do not expressly or directly address the subject of enforceability of marital settlement agreements that have the effect of modifying accrued support judgments. Rather, they speak to the court's exercise of its statutory power to satisfy or modify a judgment of record based on the grant of authority to courts when a change of circumstances occurs after the judgment is entered. The enforcement of a marital settlement agreement

is a conceptually different exercise of the court's authority from the exercise of authority based on a change of circumstances. Such enforcement finds its source not in ORS 107.135, but in the statutory power of the court to "approve an agreement for the entry of an order for the support of a party" under ORS 107.105(d). *See also McDonnal,* 293 Or at 777-78. In light of this conceptual difference, the question then becomes whether the legislature intended ORS 107.135(6) to operate in such a way as to prevent specific performance of marital settlement agreements authorized by ORS 107.105(d).

The answer to that question is found in other statutes and the case law that preceded the enactment of those statutes. The context of a statute "may include other provisions of the same statute and related statutes." *Gladhart v. Oregon Vineyard Supply Co.*, 332 Or 226, 230-31, 26 P3d 817 (2001). ORS 107.135(12)(a) provides, in part, that "[i]t is the policy of this state * * * [t]o encourage the settlement of cases brought under this section." ORS 107.135(12)(a)(B) provides, pursuant to that policy, that courts are to enforce the terms of settlement agreements "to the fullest extent possible, except when to do so would violate the law or would clearly contravene public policy." An identical mandate expressing the legislature's intention appears in ORS 107.104(1) regarding the enforceability of marital settlement agreements. Thus, when ORS 107.135(6) is read in context with ORS 107.135(12)(a) and ORS 107.104(1), it becomes apparent that the legislature intended that courts have authority to provide specific enforcement of marital settlement agreements "to the fullest extent possible[.]" In this case, it is contrary to the legislature's stated policy to deny specific performance of the parties' agreement unless it can be said that the agreement violates the law or clearly contravenes public policy.

As pointed out before, there is no assertion by the majority that the parties' agreement "clearly contravenes public policy[,]" and for good reason, as will become apparent below. Generally, when a contract will be deemed "illegal" is well-defined by this state's case law. In *Hendrix v. McKee*, 281 Or 123, 128, 575 P2d 134 (1978), the court observed,

"It is often stated that courts will not enforce 'illegal' contracts. This is an oversimplification of a legal principle, the application of which often involves construction of statutes and contractual provisions, delineation and balancing of public policies, and a difficult sorting and sifting process.

"If the consideration for the contract or its agreed purpose is illegal or against public policy on its face, it will not be enforced. If the contract on its face is not illegal or against public policy, as in the present case, the defendant assumes the burden of alleging and proving its illegality."

(Citation omitted.) Here, the parties' agreement that accrued spousal support will be satisfied retroactively in the event of the occurrence of a condition subsequent is not illegal on its face. Its consideration, the mutual promises made by the parties, is lawful, and its purpose, the satisfaction of accrued spousal support judgments, is neither illegal nor against public policy. The state has no interest in the spousal support obligations or the manner in which the parties agree they can be satisfied. Moreover, there is no conceivable violation of public policy if the parties' agreement is enforced. As the court pointed out in *Hendrix*, the counterweight to the public policy of freedom to contract is the public policy rule against enforcement of illegal contracts. Relief is denied on the basis of the public policy against enforcement of illegal contracts because a court will not aid a wrongdoer. *N. W. Amusement Co. v. Aetna Co.*, 165 Or 284, 288-89, 107 P2d 110 (1940). Husband is not a wrongdoer; he simply seeks the benefit of the bargain that he and wife voluntarily entered into, a bargain about which it cannot be said that it "violates the law."[2]

Several other comments are germane in response to the majority's position. The majority asserts that the above-cited cases "upheld agreements that dispensed with the change of circumstances requirement, which * * * began as a

---

[2] If the majority means to say that the parties' marital settlement agreement "violates the law" because it confers power on the court beyond that granted by ORS 107.135(6), then it is unclear why that is the case. The agreement itself is not illegal, and ORS 107.135(6) contains no prohibition against the making of a marital settlement agreement that provides for the retroactive satisfaction of accrued judgments. In fact, the power of the court under the statute to order satisfaction of accrued judgments suggests that an agreement to that effect would also be legal. Rather, the only question is whether the parties' agreement contravenes ORS 107.135(6) to the extent that it is unenforceable as between the parties.

'rule of case law, not statutory law.' " 187 Or App at 747. The majority's statement is only partially correct. The phrase "change of circumstances" first appeared in ORS 107.135 in 1983 when the legislature undertook for the first time to define what could constitute a "change of circumstances." *See* Or Laws 1983, ch 728, § 3. A number of the above-cited cases were decided after that date. Moreover, the import of the majority's proposed distinction is not readily apparent. The "change of circumstances" rule was well-established at the time and had as much force of law as a statute when the Supreme Court decided *McDonnal.* The *McDonnal* court expressly distinguished between the enforcement of provisions in agreements, which "[a] court should never on its own provide for[,]" 293 Or at 786, and unenforceable agreements that "go so far as to preclude the court's statutory power to modify support even where changed circumstances exist[,]" *id.* at 779. That distinction applies here. Husband seeks enforcement of a provision that the court did not have the authority to provide for on its own, but the agreement's terms do not preclude the court's exercise of its own power under ORS 107.135(6).

Also, this court has previously rejected the rationale advanced by the majority, albeit in a different factual context. In *Porter*, the majority held enforceable a marital settlement agreement that awarded the wife the sum of $1 per month in spousal support. Under the provisions of ORS chapter 107, the trial court had no authority to award a token amount of support for the sole purpose of reserving to the court in the future the power to modify the award under ORS 107.135. The dissent complained that "[t]he majority would allow the parties to do by agreement what a court could not do on its own." *Potter*, 100 Or App at 407 (Edmonds, J., dissenting, joined by Joseph, Richardson, and Graber, JJ.). Rejecting the dissent's argument, the *Porter* majority followed the rule of *Pope*, which in turn had relied on *McDonnal*, for the proposition that the change of circumstances requirement is inapplicable when the parties specifically provide to the contrary in a negotiated settlement agreement. *Porter*, 100 Or App at 405.

The reason that the agreements in *McDonnal, Pope, Porter, Hearn, Eidlin,* and this case are enforceable is further

illustrated by their effect in contrast to the effect of the agreement in *Heinonen and Heinonen*, 171 Or App 37, 14 P3d 96 (2000), relied on by the majority. In that case, the parties' stipulation operated to take away the court's statutory authority by delegating the authority of the court to modify parenting time to a nonjudicial designee. The effect of the agreement in *Heinonen* is reminiscent of the example given by the Supreme Court in *McDonnal* of an agreement that precludes the exercise by the court of its statutory power to modify support even where changed circumstances exist.

Here, the court is not deprived of any statutory authority by the parties' agreement to satisfy accrued support obligations. The thrust of the majority's argument is that the parties by their agreement may not confer authority on a court that it does not have. But that assertion misses the point. The trial court had the authority to approve the parties' agreement under the applicable statutes and case law at the time of the stipulated judgment,[3] and absent a direct "conflict" with the provisions of ORS 107.135(6), nothing prevents the subsequent enforcement of its terms. The legislature by enacting of ORS 107.104(1) and ORS 107.135(12)(a) in 2001, has made explicit what has always been implicit in all of the cases mentioned above. As we held in *Hearn*, short of the kind of conflict with the statutory powers of the court that detracts, deprives, or precludes the exercise of authority by the court, it is the responsibility of the court to give effect to the intent of the parties as reflected in their marital settlement agreement. Marital settlement agreements that provide for otherwise lawful terms that would exceed the court's authority if it were to order them on its own are enforceable as between the parties unless they take away the statutory power of the court. It follows that because the parties' agreement does not have any of those prohibited effects, it must be held enforceable in accordance with the intent of the legislature and the policy of freedom to contract.

For the above reasons, I dissent from the majority's decision to reduce spousal support effective April 1, 2001. I

---

[3] Oregon Laws 2001, chapter 203, sections 1 and 4 became effective May 25, 2001. The stipulated judgment of dissolution of marriage was entered July 19, 2000, and the judgment modifying the prior judgment is dated November 29, 2001.

would give efficacy to the parties' agreement to reduce spousal support effective December 1, 2000.

Deits, C. J., and Linder, J., join in this opinion.