Argued and submitted August 20, affirmed November 20, 2013, petition for review denied March 14, 2014 (354 Or 840)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KIMBERLY D. WRIGHT,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1000464; A149357

314 P3d 714

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and De Muniz, Senior Judge.

HADLOCK, J.

## HADLOCK, J.

Defendant appeals a judgment of conviction for three counts of first-degree aggravated theft, ORS 164.057, and five counts of first-degree theft, ORS 164.055, raising eight assignments of error. We reject defendant's first seven assignments of error without discussion. In her eighth assignment of error, defendant argues that the trial court erred in failing to grant a judgment of acquittal on one count of first-degree theft (Count 18). As explained below, we reject that contention, too, and therefore affirm.

When reviewing an order denying a motion for judgment of acquittal, we "view the evidence in the light most favorable to the state, giving the state the benefit of all reasonable inferences that may properly be drawn from that evidence, to determine whether any rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt." *State v. Miller,* 196 Or App 354, 356, 103 P3d 112 (2004), *rev den,* 338 Or 488 (2005) (citations omitted).

Defendant has known the victim, who was 82 years old during the events relevant to this case, for most of her life. The victim had employed defendant's parents at his dry-cleaning business. After the victim retired around 1993, defendant remained in sporadic contact with him, seeing him a couple of times each year. In 2009, defendant and her husband began to have problems making payments on their house. At around the same time, defendant began to contact the victim on a more frequent basis. She told the victim about her financial difficulties and began to borrow money from the victim in April 2009. The victim carefully documented those initial loans, which were small and ranged from $50 to $700.

In June 2009, defendant asked the victim for help purchasing a car. The victim agreed to loan defendant the money on the condition that his name be put on the car title to secure his loan. Because the victim did not keep enough money in his checking account to pay for the car, defendant accompanied the victim to his bank, where he withdrew $13,930 from his home equity line of credit (HELOC) and had the bank issue a check to defendant. Defendant used

that money to purchase a car, but the victim's name was not on the title.[1]

Before he began to loan defendant money, the victim typically withdrew between $400 and $600 in cash from his checking account every month for living expenses. To that point, he never had made any withdrawals from his HELOC. After the victim loaned defendant money to buy the car, however, a series of additional withdrawals resulted in a total of nearly $70,000 being taken from the victim's HELOC between June 2009 and January 2010, not including a $30,000 loan that the victim made to his son in November 2009. The victim had little or no recollection of specific transactions (other than the loan to his son), but he did remember going to the bank with defendant. During each of those bank visits, defendant conducted all business with a teller or manager, generally withdrawing both cash and a check from the victim's HELOC, and picking up the cash and check that bank personnel placed on the counter. While defendant engaged in those transactions, the victim typically discussed golf or other matters with bank personnel several feet away. The victim trusted defendant and signed any documents that defendant asked him to sign. On at least three occasions, a small deposit was made back into the victim's HELOC on the same day as a large amount of money was withdrawn from that line of credit. The first such event occurred on October 13, 2009, when a $15,000 withdrawal was made from the victim's HELOC and two $200 deposits were made back into the HELOC. Similar transactions occurred in December and January: On December 21, 2009, a $3,000 withdrawal was made from the victim's HELOC and $100 was deposited back in. On January 11, 2010, a $2,700 cash withdrawal—the transaction at issue in Count 18—was made from the victim's HELOC and $201.55 was deposited back in. On another occasion in August 2009, a check was written to defendant from the victim's checking account for $2,500 on the same day that $106.58 was deposited into the victim's HELOC. The victim did not keep a record of those transactions on a ledger, as he had with the smaller $50 to $700 loans that he previously had made to defendant.

---

[1] The record is not clear as to whether the victim's name was placed on the title and later removed or never placed on the title at all.

A manager from the victim's bank handled some of the transactions described above and testified about the pattern that he saw develop. Defendant would pick up the withdrawal from the victim's HELOC, count the cash, and then give some of the cash back to the manager to redeposit into the victim's HELOC. The manager explained that the vast majority of the cash withdrawn from the victim's account stayed with defendant, who deposited only small amounts back into the victim's HELOC. The manager "pretty clearly" remembered that defendant "would say, 'Look. [Victim], I'm making a payment.' And * * * she would say, 'Can you get two receipts?'" The manager testified that those transactions raised "red flags" for him. The manager testified that those transactions raised "red flags" for him. "I thought it was kinda strange that you would borrow this money, and then, with the money you borrowed, turn around and use it as a payment." He went on to say that he felt "uneasy about the entire transaction" and that it added to his "suspicion that something just wasn't right."

The manager felt that defendant was trying to create the impression that she was making payments toward the victim's account. Indeed, the victim testified that he believed that defendant was at his bank making payments on the debt that she owed the victim as a result of his prior loans to her. When asked about the January 2010 withdrawal at issue in Count 18, the victim testified that he did not remember that transaction or remember authorizing it.

The small deposits back into the victim's HELOC were not the only transactions that occurred on the dates of the large withdrawals from that line of credit. A police officer who later investigated the case testified that, on at least four occasions, deposits were made into defendant's checking accounts shortly after money had been withdrawn from the victim's HELOC. Such events occurred in July, August, September, and October 2009.

The state also presented evidence regarding defendant's possession of large sums of cash. During 2009—the year in which the withdrawals from the victim's HELOC started—defendant frequently stayed at a hotel near the victim's house. The hotel manager testified that on multiple occasions defendant brought large amounts of money to

store in the hotel's safe. Once, the hotel manager asked to borrow $500 from defendant for a car payment. Defendant produced the money from a "wad of cash she had that she was putting in the safe."

In November 2009, the victim's son and daughter-in-law sought to borrow $30,000 from the victim's HELOC to assist in closing a sale on a condominium they owned. The family members previously had been aware that the victim had loaned defendant money for a car, but it was not until they wished to borrow from the victim's HELOC that they discovered that approximately $66,000 had been taken from that line of credit. The victim's daughter-in-law testified that, when they told the victim how much money was gone, "[h]e was shocked. He seemed confused about how that could possibly happen. Disbelief." In early February 2010, the victim's son and daughter-in-law contacted the police. No additional withdrawals were taken from the victim's HELOC after that point.

Investigating officers later obtained a warrant to search defendant's house. During the resulting search, officers found account statements and payment-due notices for the victim's HELOC in defendant's spare bedroom, along with several withdrawal receipts from the line of credit. The state presented that evidence as significant because it contrasted with testimony from the victim's son and the victim that the victim always kept all of his important documents—bank account statements, information about business arrangements, etc.—in his own home, on a desk near the kitchen.

The state prosecuted defendant on a "theft by deception" theory. After a bench trial, the court convicted defendant of the following crimes:

1. First-degree aggravated theft for $13,930 withdrawn from the victim's HELOC on June 15, 2009 (the money that defendant used to purchase a car);

2. First-degree aggravated theft for $10,000 withdrawn from the victim's HELOC on July 8, 2009;

3. First-degree theft for funds withdrawn from the victim's HELOC on July 23, 2009 (the state had charged

defendant with withdrawing somewhat over $9,000, but the court found that the state had proved only the loss of an amount more than $1,000 but less than $5,000);

4. First-degree theft for $6,000 withdrawn from the victim's HELOC on August 26, 2009;

5. First-degree theft for funds withdrawn from the victim's HELOC on September 18, 2009 (the state had accused defendant of withdrawing $12,500, but the court found that the state had only proven a $9,000 loss);

6. First-degree aggravated theft for $15,000 withdrawn from the victim's HELOC on October 13, 2009;

7. First-degree theft for an amount of more than $5,000 withdrawn from the victim's HELOC in late December 2009; and

8. First-degree theft for $2,700 withdrawn from the victim's HELOC on January 11, 2010 (the transaction at issue in Count 18).

The court granted defendant's motion for judgment of acquittal for 10 charged counts of identity theft. The court also found defendant not guilty of one count of first-degree theft for $3,500 withdrawn from the victim's HELOC on November 16, 2009, noting:

"I'm going to find you not guilty of Count 13, because I don't know what happened to that $3,500. I know it was taken out. I suspect you probably had something to do with it. I suspect it ended up in your pocket. But the State has not proven beyond a reasonable doubt that—that it ended up with you in any account or—and I don't know what happened to it."

Defendant challenges each of her convictions on appeal, arguing that the state did not prove all of the elements of theft by deception. A person commits that crime when he or she "[(1)] obtain(s) property from another, (2) by promising performance that the person intends or knows will not be performed, (3) with the intent to defraud." *State v. Reynolds*, 246 Or App 152, 158, 265 P3d 22 (2011); *see* ORS 164.085 (defining crime). As noted, we write only to address defendant's eighth assignment of error, in which

she contends, with respect to Count 18, that the state did not prove that defendant obtained money from the victim in association with the January 11, 2010, withdrawal from the HELOC because "no comparable deposits were made in either of defendant's bank accounts around the time of" that withdrawal and because neither bank personnel nor the victim specifically recalled the transaction. Because the record includes no such evidence, defendant argues, her conviction on Count 18 was based "merely on an inappropriate stacking of inferences." The state responds that the evidence of defendant's overall scheme, combined with the victim's testimony that he was not aware of the transaction and did not believe that he had authorized it, plus the evidence that the unauthorized withdrawals stopped after January—around the time that law-enforcement personnel were alerted to defendant's conduct—enabled a reasonable factfinder to find that defendant obtained the money that was withdrawn on January 11, 2010. We agree with the state.

Our review is not for whether we believe that defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a factfinder to have so found. *State v. Martin*, 243 Or App 528, 531-32, 260 P3d 197 (2011). That question is governed by the following principles:

> "In establishing [an] element, the state may rely on circumstantial evidence and reasonable inferences flowing from that evidence. An inferred fact must be one that the jury is convinced follows beyond a reasonable doubt from the underlying facts. But the requirement that the jury be convinced beyond a reasonable doubt does not mean that a particular inference must inevitably follow from the established facts. Rather, the established facts may support multiple reasonable inferences and, if they do, which inference to draw is for the jury to decide.

> "Whether particular circumstantial evidence is sufficient to support a particular inference, however, is a legal question for a court to decide. 'There is a difference between inferences that may be drawn from circumstantial evidence and mere speculation.' *State v. Vaughn*, 175 Or App 192, 201, 28 P3d 636 (2001). Reasonable inferences are permissible; speculation and guesswork are not. As we have observed before, the line between permissible inferences and impermissible speculation is 'sometimes faint.'

*Hutchinson and Hutchinson*, 187 Or App 733, 741, 69 P3d 815 (2003). The line is also sometimes difficult to articulate with precision. But we agree with the federal courts, which frequently describe it in these terms:

> "'The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts. * * *'
>
> "*Tose v. First Pennsylvania Bank, N. A.*, 648 F2d 879, 895 (3d Cir), *cert den*, 454 US 893 (1981)."

*State v. Bivins*, 191 Or App 460, 466-67, 83 P3d 379 (2004) (some citations omitted).

Applying the above principles, we conclude that the state presented legally sufficient evidence from which the factfinder could logically infer beyond a reasonable doubt that defendant committed first-degree theft by withdrawing money from the victim's HELOC on January 11, 2010. A factfinder could determine, from the state's evidence, that defendant had engaged in a months-long scheme of withdrawing significant sums from the victim's HELOC and then depositing a small amount back into the HELOC, leading the victim to believe that defendant was not withdrawing funds, but instead was actually depositing money to pay back her debt to the victim. The bank manager testified that it did not make fiscal sense to borrow money and then immediately use that money to pay down a small portion of the loan, as defendant was doing. A factfinder also could infer that the events of January 11, 2010, were part of that scheme. On that day, $2,700 in cash was withdrawn from the victim's HELOC and $201.55 was deposited back into the HELOC, just as large withdrawals and corresponding small "payments" to the victim had occurred on previous dates. The inference that the January 2010 withdrawal was part of defendant's overall scheme is strengthened by evidence that (1) the victim had never used his HELOC before defendant asked for a car loan, (2) the January withdrawal was the

last one from the HELOC, from which no more money was withdrawn after police officers began investigating defendant's activities, and (3) the victim seemed confused and shocked by the amount of money missing.

The reasonableness of such an inference is not undermined by the lack of evidence that defendant made any corresponding deposits to her bank accounts immediately following the January 2010 withdrawal. When defendant withdrew both cash and checks in earlier transactions, she never had deposited the entire amount into her checking accounts. Additionally, testimony showed that defendant frequently had large sums of cash when staying at a hotel near the victim. Consequently, the factfinder was not compelled to find, based on the lack of a corresponding deposit into the victim's bank accounts, that she did not receive the money that was withdrawn from the victim's HELOC in January.

In sum, a factfinder reasonably could infer that the large withdrawal from the victim's HELOC in January 2010 and the corresponding small deposit back into it evidenced a specific incident of defendant's overall scheme of stealing money from the victim by deceiving him into thinking that she was repaying her debt. Accordingly, the trial court did not err when it denied defendant's motion for judgment of acquittal on Count 18.

Affirmed.